**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | | |
|---|---|---|
| EDDIE MARIE HUDSON, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| vs. | § | CIVIL ACTION NO. 10-CV-3823 |
| | § | |
| MICHAEL J. ASTRUE, | § | |
| COMMISSIONER OF SOCIAL | § | |
| SECURITY, | § | |
| | § | |
| Defendant. | § | |

**MEMORANDUM AND RECOMMENDATION ON
CROSS-MOTIONS FOR SUMMARY JUDGMENT**

This matter was referred by United States District Judge Lee H. Rosenthal, for full pre-trial management, pursuant to 28 U.S.C. § 636(b)(1)(A) and (B). (Docket Entry # 3).  Cross-motions for summary judgment have been filed by Plaintiff Eddie Marie Hudson ("Plaintiff," "Hudson"), and by Defendant Michael J. Astrue ("Defendant," "Commissioner"), in his capacity as Commissioner of the Social Security Administration ("SSA"). (Plaintiff's Motion for Summary Judgment ["Plaintiff's Motion"], Docket Entry #10); (Defendant's Cross-Motion for Summary Judgment, Docket Entry #9); (Memorandum in Support of Defendant's Cross-Motion for Summary Judgment ["Defendant's Motion"], Docket Entry 9, Ex. 1). Each party has responded in opposition to the other's motion. (Plaintiff's Response to Defendant's Motion for Summary Judgment ["Plaintiff's Response"], Docket Entry #11); (Defendant's Reply to Plaintiff's Cross-Motion for Summary Judgment ["Defendant's Reply"], Docket Entry # 12). After a review of the pleadings, the evidence presented, and the applicable law, it is **RECOMMENDED** that Defendant's motion be **GRANTED**, and that Plaintiff's motion be **DENIED**.

1

**BACKGROUND**

On November 18, 2008, Plaintiff Eddie Marie Hudson filed an application for Social Security Disability Benefits ("DIB") and Supplemental Security Income payments ("SSI"), under Titles II and XVI of the Social Security Act ("the Act").[1]  (Transcript ["Tr."] at 68-71, 125 & 127); (Plaintiff's Motion at 1); (Defendant's Motion at 1).   In both applications, Plaintiff claimed that her disability began on May 1, 2007.  (Tr. at 125 & 127).   Hudson states that she suffers from arthritis and major depression without psychotic features.  (Tr. at 137).   On April 2, 2009, the SSA denied both applications. (Tr. at 68-69).

Plaintiff petitioned the SSA to reconsider that decision, but that request was denied.  (Tr. at 70-71).  On June 22, 2009, Plaintiff requested a hearing before an administrative law judge ("ALJ").  (Tr. at 94).  That hearing, before ALJ Allen Erickson, took place on September 21, 2009.  (Tr. at 23).  Plaintiff appeared with an attorney, Victor Makris ("Mr. Makris"), and she testified in her own behalf.  (Tr. at 29-43).  The ALJ also heard testimony from a medical expert, Dr. Nancy Tarrand ("Dr. Tarrand"), and a vocational expert witness Wallace Stanfill ("Mr. Stanfill").  (Tr. at 43-57, 58-66)

Following the hearing, the ALJ engaged in the following five-step, sequential analysis to determine whether Plaintiff was capable of performing substantial gainful activity or was, in fact, disabled:

1.      An individual who is working or engaging in substantial gainful activity will not be found disabled regardless of the medical findings. 20 C.F.R. §§ 404.1520(b) and 416.920(b).

---

[1] The application dates on the "Application Summar[ies]" list November 19, 2008, and November 11, 2008, as the dates of Plaintiff's application for DIB and SSI benefits, respectively.  (Tr. at 125 & 127).  However, the "Disability Determination" forms list November 18, 2008 as Plaintiff's filing date for both claims, and neither party disputes that date.  (Tr. at 68-71); (Plaintiff's Motion at 1); (Defendant's Motion at 1).

2.      An individual who does not have a "severe impairment" will not be found to be disabled. 20 C.F.R. §§ 404.1520(c) and 416.920(c).

3.      An individual who "meets or equals a listed impairment in  Appendix    1" of the regulations will be considered disabled without consideration of vocational factors. 20 C.F.R. §§ 404.1520(d) and 416.920(d).

4.      If an individual is capable of performing the work he has done in the past, a finding of "not disabled" must be made. 20 C.F.R. §§ 404.1520(e) and 416.920(e).

5.      If an individual's impairment precludes performance of his past work, then other factors, including age, education, past work experience, and residual functional capacity must be considered to determine if any work can be performed. 20 C.F.R. §§ 404.1520(f) and 416.920(f).

*Newton v. Apfel*, 209 F.3d 448, 453 (5th Cir. 2000); *Martinez v. Chater*, 64 F.3d 172, 173-74 (5th Cir. 1995); *Muse v. Sullivan*, 925 F.2d 785, 789 (5th Cir. 1991); *Wren v. Sullivan*, 925 F.2d 123, 125 (5th Cir. 1991); *Harrell v. Bowen*, 862 F.2d 471, 475 (5th Cir. 1988).  It is well settled that, under this analysis, the claimant bears the burden to prove any disability that is relevant to the first four steps.  *See Wren*, 925 F.2d at 125.  If she is successful, the burden then shifts to the Commissioner, at step five, to show that she is able to perform other work that exists in the national economy.  *See Myers v. Apfel*, 238 F.3d 617, 619 (5th Cir. 2001); *Wren*, 925 F.2d at 125.  "A finding that a claimant is disabled or is not disabled at any point in the five-step review is conclusive and terminates the analysis." *Lovelace v. Bowen*, 813 F.2d 55, 58 (5th Cir. 1987).

It must be emphasized that the mere presence of an impairment does not necessarily establish a disability. *See Anthony v. Sullivan*, 954 F.2d 289, 293 (5th Cir. 1992) (quoting *Milam v. Bowen*, 782 F.2d 1284, 1286 (5th Cir. 1986)).  An individual claiming disability insurance benefits under the Act has the burden to prove that he suffers from a disability.  *See Johnson v. Bowen*, 864 F.2d 340, 343 (5th Cir. 1988); *Cook v. Heckler*, 750 F.2d 391, 393 (5th Cir. 1985). Under the Act, a claimant is deemed disabled only if he demonstrates an "inability to engage in

any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death, or which has lasted or can be expected to last for a continuous period of not less than twelve months." *Selders v. Sullivan*, 914 F.2d 614, 618 (5th Cir. 1990) (citing 42 U.S.C. § 423(d)(1)(A)). "Substantial gainful activity" is defined as "work activity involving significant physical or mental abilities for pay or profit." *Newton*, 209 F.3d at 452. A physical or mental impairment is "an impairment that results from anatomical, physiological or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." *Hames v. Heckler*, 707 F.2d 162, 165 (5th Cir. 1983) (citing 42 U.S.C. § 423(d)(3)). Further, the impairment must be so severe as to limit the claimant so that "he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any kind of substantial gainful work which exists in the national economy." *Greenspan v. Shalala*, 38 F.3d 232, 236 (5th Cir. 1994) (citing 42 U.S.C. § 423(d)(2)(A)).

Based on these principles, as well as his review of the evidence presented at the hearing, the ALJ found that Hudson met "the insured status requirements of the Social Security Act through December 31, 2007," and that she had "not engaged in substantial activity since May 1, 2007, [her] alleged onset date." (Tr. at 13). The ALJ recognized that Hudson had a "history of affective and mood disorders and [a] disorder of the back with chronic pain." (*Id.*). Although he determined that these impairments were "severe," the ALJ concluded that Plaintiff "does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments" in the applicable SSA regulations. (*Id.*). The ALJ then decided that, even though Hudson was unable to perform her "past relevant work," she had the residual functional capacity ("RFC") to perform "light work." (Tr. at 15, 18). However, the ALJ placed the

4

following limitations on such work: "understanding, remembering, and carrying out short, simple instructions"; "limited contact with the general public and co-workers"; and "tasks that are repetitive in nature." (Tr. at 15). With these findings, the ALJ established that "there are jobs that exist in significant numbers in the national economy that the claimant can perform." (Tr. at 18). For that reason, the ALJ concluded that Hudson "has not been under a disability, as defined in the Social Security Act, from May 1, 2007, through the date of this decision," and he denied Plaintiff's application for insurance benefits, on October 9, 2009. (Tr. at 8, 19-20).

On December 8, 2009, Plaintiff requested an Appeals Council Review of the ALJ's decision. (Tr. at 5). The Appeals Council found no reason to review the ALJ's decision and denied her request, on July 28, 2010. (Tr. at 1). With that ruling, the ALJ's findings became final, and, on October 11, 2010, Hudson filed this suit, pursuant to section 205(g) of the Act (codified as amended at 42 U.S.C. § 405(g)), to challenge that decision. (Plaintiff's Original Complaint, Docket Entry #1). After a review of the pleadings, the evidence presented, and the applicable law, it is **RECOMMENDED** that Defendant's motion be **GRANTED**, and that Plaintiff's motion be **DENIED**.

**STANDARD OF REVIEW**

Federal courts review the Commissioner's denial of disability benefits only to ascertain whether the final decision is supported by substantial evidence and whether the proper legal standards were applied. *See Newton*, 209 F.3d at 452 (citing *Brown v. Apfel*, 192 F.3d 492, 496 (5th Cir. 1999)). "If the Commissioner's findings are supported by substantial evidence, they must be affirmed." *Id.* (citing *Martinez*, 64 F.3d at 173). "Substantial evidence is such relevant evidence as a reasonable mind might accept to support a conclusion. It is more than a mere scintilla and less than a preponderance." *Ripley v. Chater*, 67 F.3d 552, 555 (5th Cir. 1995); *see*

5

*Martinez*, 64 F.3d at 173 (quoting *Villa v. Sullivan*, 895 F.2d 1019, 1021-22 (5th Cir. 1990)).  On review, the court does not "reweigh the evidence, but . . . only scrutinize[s] the record to determine whether it contains substantial evidence to support the Commissioner's decision." *Leggett v. Chater*, 67 F.3d 558, 564 (5th Cir. 1995); *see Fraga v. Bowen*, 810 F.2d 1296, 1302 (5th Cir. 1987).  In making this determination, the court must weigh the following four factors: the objective medical facts; the diagnoses and opinions from treating physicians on subsidiary questions of fact; Plaintiff's own testimony about his condition; and Plaintiff's educational background, work history, and present age.  *See Wren*, 925 F.2d at 126.  If no credible evidentiary choices or medical findings exist that support the Commissioner's decision, then a finding of no substantial evidence is proper.  *See Johnson*, 864 F.2d at 343.

**DISCUSSION**

Before this court, Plaintiff challenges the ALJ's decision for five primary reasons.  (*See* Plaintiff's Motion).   First, Hudson claims that the ALJ failed to "conduct a meaningful evaluation of her credibility."  (Tr. at 8, 10).   Hudson next contends that the ALJ failed to consider and discuss how the side effects from her medications affect her ability to work.  (*Id*. at 4).   Hudson also complains that the ALJ failed to consider the low Global Assessment Functioning ("GAF") scores that Plaintiff's treating and examining physicians assigned to her.  (*Id*. at 5, 7).  She argues further that the opinion given by the vocational expert witness does not constitute substantial evidence, because he relied on a flawed hypothetical question.  (*Id*. at 12).  Finally, Plaintiff contends that the ALJ erred in failing to consider whether she is "capable of *maintaining*" employment.   (*Id*. at 13) (additional emphasis omitted).   Defendant insists, however, that the ALJ properly considered all of the available evidence in determining that

Hudson is not disabled, and that substantial evidence supports his decision to deny her benefits. (Defendant's Motion at 5-9).

***Medical Facts, Opinions, Diagnosis***

The earliest available records show that Hudson received medical treatment from Alice A. Ajim, M.D. ("Dr. Ajim"), between March, 2004, and August, 2008.  (Tr. at 196-219).  On March 24, 2004, Hudson appeared at Dr. Ajim's office complaining of lower back pain that had lasted for one year.  (Tr. at 219).  Dr. Ajim diagnosed Plaintiff as suffering from lower back pain and hypertension, but the remainder of the record is illegible.  (*Id*.).  The next record, dated June 23, 2004, lists Plaintiff's medication as "Loratab 10 [sic]."[2]  (Tr. at 218).  Plaintiff visited Dr. Akim on July 6, 2004, complaining of headaches and lower back pain.  (Tr. at 217).  In addition to Lortab, Plaintiff was prescribed "Ultram."[3]  (*Id*.).  On August 27, 2004, Dr. Akim again examined Hudson, and at that time, she repeated Plaintiff's diagnoses of lower back pain, hypertension, and headaches.

On September 13, 2004, Hudson appeared for a follow-up exam with Dr. Akim.  (Tr. at 214).  During that visit, Dr. Akim added thyromegaly[4] to the list of Plaintiff's diagnoses.[5]  (*Id*.).  On that date, the doctor prescribed "Levaquin"[6] as well as Lortab.  (*Id*.).  Almost three months later, Plaintiff complained to Dr. Akim of a "knot behind [her] l[eft] ear."  (Tr. at 213).  The

---

[2] "Lortab 10" is "hydrocodone bitartrate and acetaminophen."  RxList, http://www.rxlist.com/lortab-10-drug.htm (last visited January 30, 2012).  "Hydrocodone bitartrate" is "a narcotic antitussive" that is "prescribed in the treatment of cough."  MOSBY'S MEDICAL, NURSING, & ALLIED HEALTH DICTIONARY at 783 (5th Ed. 1998). "Among [its] more serious adverse reactions are drug dependence and respiratory and circulatory depression."  *Id*.
[3] "Ultram" is also known as "tramadol" and "is used to relieve moderate to moderately severe pain."  U.S. National Library of Medicine, http://www.ncbi.nlm.nih.gov/pubmedhealth/PMH0000960/ (last visited January 30, 2012).
[4] "Thyromegaly" is "enlargement of the thyroid gland."  MOSBY'S at 1617.
[5] There are additional ailments listed on that record, but they are illegible.  (Tr. at 214).
[6] "Levaquin" is "used to treat infections such as pneumonia, chronic bronchitis; and sinus, urinary tract, kidney, prostate [], and skin infections."  U.S. National Library of Medicine, http://www.ncbi.nlm.nih.gov/pubmedhealth/PMH0000129/ (last visited January 30, 2012).

doctor prescribed "[L]orazepam."[7]  The next record, a "Telephone Interaction Form," dated December 23, 2004, notes that Plaintiff "wants [a] refill" of Hydrocodone[8] [and] Lorazepam, but that Dr. Akim had already "denied" her request two days earlier.  (Tr. at 212).

In January 2005, Plaintiff sought treatment from Dr. Akim, because of "fatigue" and "no appetite."  (Tr. at 211).  Dr. Akim reported that Plaintiff had a sore throat, and "abdominal pains" when she took "deep breaths."  (*Id*.).  Despite noting that Plaintiff complained of "fatigue on Lortab," Dr. Akim again prescribed that medication.  She also continued Plaintiff's prescription for Ultram, and included low blood pressure and "cigarette smoking disorder" along with Plaintiff's other illnesses.  (*Id*.).  On May 2, 2005, Plaintiff saw Dr. Akim to follow-up on her complaints of back pain.  (Tr. at 208).  Dr. Akim prescribed an oral contraceptive for Hudson, and referred her for a thyroid ultrasound.  (*Id*.).  A note on that record indicates that Plaintiff "missed [an] app[ointment]t" on May 16, 2006.  (*Id*.).

The next time that Plaintiff saw Dr. Akim was three years later, on May 22, 2008.  (Tr. at 207).  Hudson complained of headaches and told the doctor that her "nerves [we]re very bad." (*Id*.).  Dr. Akim noted that Plaintiff had lost weight and that she reported having "no appetite." (*Id*.).  Plaintiff continued to suffer from lower back pain, hypertension, headaches, [and] thyromegaly.  (*Id*.).  Dr. Akim told Hudson to return in one month.  (*Id*.).  Two months later, on July 25, 2008, Plaintiff had a check-up for her hypertension, but at that time, she also complained of a "nervo[us] upset stomach."  (Tr. at 206).  In addition to her previous diagnoses, Dr. Akim

---

[7] "Lorazepam is used to relieve anxiety."  U.S. National Library of Medicine, http://www.ncbi.nlm.nih.gov/pubmedhealth/PMH0000560/ (last visited January 30, 2012).

[8] "Hydrocodone" is "available only in combination with other ingredients" and is used to "reliev[e] pain."  U.S. National Library of Medicine, http://www.ncbi.nlm.nih.gov/pubmedhealth/PMH0000014/ (last visited January 30, 2012).

reported that Hudson was a "smoker" and that she suffered from "GERD."[9] (*Id*.). Dr. Akim then prescribed Darvocet[10] for Plaintiff, in addition to Ultram. (*Id*.).

On August 27, 2008, Plaintiff complained to Dr. Akim of "no appetite," "bad nerves," "back pain," and a "bad cough." (Tr. at 205). Hudson reported taking Protonix[11] and Darvocet. (*Id*.). Dr. Akim noted that Plaintiff "[d]idn't do labs," and that she was "loosing [sic] weight." (*Id*.). In fact, Dr. Akim added "anorexia" to Plaintiff's diagnoses. (*Id*.). The physician prescribed Levaquin, as well as other medications that are not legible. She advised Hudson "against smoking." (*Id*.). The results from laboratory tests taken that day revealed Plaintiff's cholesterol level to be 231, which is considered "[o]ut of [r]ange." (Tr. at 197). Those reports also show that Hudson tested positive for marijuana use. (Tr. at 199).

On April 16, 2007, Plaintiff visited the "P[sychiatric] E[mergency] S[ervice] Triage" center at the Mental Health Mental Retardation Authority of Harris County ("MHMRA"). (Tr. at 243, 383-388). Plaintiff complained of "[d]epression, stress, [and] mood swings." (Tr. at 243). Vinay Kapoor, MD ("Dr. Kapoor") attended her on that date. (Tr. at 252). Hudson reported "symptoms of sadness, crying spells, sleep disturbance, poor appetite, weight loss (12 lbs. in [the] last 7 months), low energy, [becoming] easily tired, [and] feelings of guilt." (Tr. at 247). Hudson listed her "[m]ultiple stressors" as her "job loss," "financial problems," "bankruptcy," losing her house, and the fact that she is a "single parent." (*Id*.). She denied having any suicidal or homicidal thoughts, or any "psychotic" or "manic symptoms." (*Id*.). Plaintiff sought medication for her ailments. (Tr. at 244). She said she took Xanax, but had finished her supply

---

[9] "Gastroesophageal reflux disease (GERD) is a condition in which the stomach contents (food or liquid) leak backwards from the stomach into the esophagus (the tube from the mouth to the stomach). This action can irritate the esophagus, causing heartburn and other symptoms. U.S. National Library of Medicine, http://www.ncbi.nlm.nih.gov/pubmedhealth/PMH0001311/ (last visited January 31, 2012).
[10] "Darvocet" is a "narcotic pain reliever[]" that "is used to relieve mild to moderate pain." Drugs.com, http://www.drugs.com/darvocet.html (last visited January 31, 2012).
[11] Protonix "is used to treat the symptoms of GERD." U.S. National Library of Medicine, http://www.ncbi.nlm.nih.gov/pubmedhealth/PMH0000177/ (last visited January 31, 2012).

the previous weekend.  (*Id.*).   The record also noted Plaintiff's simultaneous treatment for "backaches."   (*Id.*).   During the visit, Dr. Kapoor observed that Hudson made "good eye contact," was "cooperative," and that her "thought process" was "goal-directed."  (Tr. at 250). However, he also described her as "anxious," "[d]ysthymic,"[12] and "psychomotor retarded,"[13] although her speech was "spontaneous."  (Tr. at 250).   Dr. Kapoor assessed her to be of "average" intellect and he diagnosed her to be suffering from "maj[or] depression."  (Tr. at 251, 253).  He also found that Hudson had "no current medical problems."  (Tr. at 252).  Dr. Kapoor prescribed Celexa for Hudson, but also "[d]iscussed [her] diagnosis" with her, as well as her "treatment plan, medication alternatives, side effects, [and their] risks [and] benefits."  (Tr. at 251).   He referred Hudson to "crisis counseling" and instructed her to follow up with the MHMRA's eligibility center.  (*Id.*; Tr. at 253, 389).

Hudson's next records are from the Harris County Sheriff's Office Health Services Bureau.  (Tr. at 220-233).  It appears that she was charged with prescription fraud.  (Tr. at 232, 289, 345).  An initial record noted that Plaintiff had a history of "Xanax[14] use" and that she also took Ultram and Norvasc.[15]  (Tr. at 228-29).

On September 27, 2008, Plaintiff underwent an "Initial Psychiatric Assessment" by Faye E. Sadberry, M.D. ("Dr. Sadberry") with MHMRA.  (Tr. at 232).  At that time, Plaintiff's "[c]hief [c]omplaint" was "nerves."  (*Id.*).  Hudson reported that she was unemployed, which caused her to be "anxious" and "stress[ed]."  (*Id.*).  Plaintiff told Dr. Sadberry that she had "a

---

[12] "Dysthymic disorder" is "a disorder of mood in which the essential feature is a chronic disturbance of mood of at least 2 years' duration.  It involves either depressed mood or loss of interest or pleasure in all or almost all usual activities and pastimes, and associated symptoms, but not of sufficient severity and duration to meet the criteria for a major depressive episode."  MOSBY'S at 527.

[13] "Psychomotor retardation" is "a generalized slowing of motor activity related to a state of severe depression."  MOSBY'S at 1348.

[14] "Xanax," also known as "Alprazolam[,] is used to treat anxiety disorders and panic disorder."  U.S. National Library of Medicine, http://www.ncbi.nlm.nih.gov/pubmedhealth/PMH0000807/ (last visited February 1, 2012).

[15] "Norvasc," also known as "Amlodipine[,] is used "to treat high blood pressure and chest pain."  U.S. National Library of Medicine, http://www.ncbi.nlm.nih.gov/pubmedhealth/PMH0000914/ (last visited February 1, 2012).

Masters and [a] Ph.D. in clinical[] sociology." (*Id.*).   However, Hudson denied having

"psychosis," a "depressed mood," or suicidal or homicidal thoughts. (*Id.*).  Hudson reported that

she took Lorazepam for her anxiety, but that she had not taken her medication in a week. (*Id.*).

Plaintiff "denie[d] all illicit drug use." Dr. Sadberry reported that Plaintiff appeared "unkempt,"

but that her "thought processes" were "goal-directed," and her "psychomotor"[16] skills were

normal. (Tr. at 233).   The doctor also determined Hudson to be "somewhat grandiose vs.

truthful." (*Id.*).  Dr. Sadberry prescribed Klonopin[17] for Plaintiff and referred her to another

doctor to treat her hypertension. (*Id.*).  Dr. Sadberry found that Plaintiff had an anxiety disorder,

hypertension, and "problems related to interaction with [the] legal system," but she concluded

that Plaintiff did not exhibit any "developmental/personality disorder." (Tr. at 224).

The next month, a "Progress Note" from the Harris County Sheriff's Office Health

Services Bureau reports the following:

> P[atien]t was interviewed - … [and] presented [with a] neutral mood [and] calm
> affect.  P[atien]t said, "I'm sorry" 12 times in a 10 min[ite] interview…. P[atien]t is
> not receiving psyc[hiatric] med[ication]s [and] has no M[edical] A[dministration]
> R[ecord].  Tracker – shows a [prescription] for Clonazepam. … There appears to be
> a med[ical] order for Xanax [on] 9/28[] but the pharmacy did not sign off.  This
> will be presented to a psyc[hiatric] doctor.

(Tr. at 223).

During another "Health Assessment" at the Sheriff's Bureau, on October 8, 2008,

Hudson reported that she "hasn't received any med[ication]s." (Tr. at 221).  In her "Mental

Status Exam" the next day, Plaintiff's hygiene appeared to be "good," and she was "alert" and

"cooperative." (Tr. at 222).   The attending physician reported that her emotions were

---

[16] "Psychomotor" means "pertaining to or causing voluntary movements usually associated with neural activity." MOSBY'S at 1347.

[17] "Klonopin," also known as "Clonazepam[,] is used "to control certain types of seizures" and "to  relieve panic attacks."  U.S. National Library of Medicine, http://www.ncbi.nlm.nih.gov/pubmedhealth/PMH0000635/ (last visited February 1, 2012).

"appropriate," that her "thought process" was "coherent," and that she was "oriented to" person, place, and time.  (*Id*.).  The last record from the sheriff's office states that Hudson "needs [a] MHMRA referral/eval[uation]."  (Tr. at 220).  The jail released Plaintiff on October 23, 2008. (Tr. at 294).

Plaintiff visited MHMRA's eligibility center on November 12, 2008, and was found eligible to receive mental health services.  (Tr. at 260).  At that time, Plaintiff repeated her previous complaints of sleeplessness, anxiety, depression, and guilt.  (*Id*.).  She also reported having "no anger," "no outbursts," "no irritability," and "no social isolation."  (*Id*.).  In addition, Hudson denied any hallucinations, or suicidal and homicidal thoughts.  (*Id*.).  She claimed that she did not abuse drugs or alcohol.  (*Id*.)

Plaintiff next visited MHMRA on December 5, 2008.  (Tr. at 237).  Plaintiff reported to the attending staff member that she had "[decreased] sleep," "nervousness," "hurting," "[decreased] concentration," and that she was "irritable and angry a[t] times."  (*Id*.).  Hudson also stated that she "sometimes hear[s] voices."  Plaintiff claimed to have been without medication for two weeks and she requested refills of her prescriptions.  (*Id*.).  That record notes further that Plaintiff had been diagnosed as suffering from "bi-polar in the past."  (*Id*.).  MHMRA referred Hudson to a doctor "for medications."  (*Id*.).

Plaintiff then saw a psychiatrist, "Dr. Kopecky," to whom she reported that she had been without medication for three weeks.  (Tr. at 239, 298).  She again denied alcohol or recreational drug use.  (*Id*.).  Dr. Kopecky noted that Hudson "tends to respond 'I'm sorry,'" and that she referred to it as a 'habit.'"  (*Id*.).  Dr. Kopecky found Hudson to be "anxious," and he remarked that she exhibited "very reactive expressions when discussing [her] med[ication]s/treatment," such as being "puzzled," and "concerned."  (*Id*.).  Finally, Dr. Kopecky noted that Plaintiff had

no audio or visual hallucinations, no suicidal thoughts, and that she "denied psychosis." (*Id.*). The doctor diagnosed her as suffering from "maj[or] depression," and he assessed her GAF score to be 40.[18]  (Tr. at 240).  He continued her prescription for Celexa, but also added "Atarax for anxiety" and "Trazodone for sleep."  (*Id.*).  Dr. Kopecky referred Plaintiff to MHMRA's "eligibility center"[19] and advised her to "follow up with [the] center as soon as possible." (Tr. at 241).

On December 19, 2008, Bruce C. Wiley, M.D. ("Dr. Wiley"), with MHMRA, evaluated Plaintiff and found her to be "very dramatic" and "very educated." (Tr. at 258).  In particular, he reported that she "like[d] to throw the word 'bipolar' around though [she] doesn't report[] any particular symptoms that meet [the disorder's] criteria." (*Id.*).  Dr. Wiley also noted that Hudson claimed to hear "'voices.'" (Tr. at 256).  In making that notation, however, Dr. Wiley added that Plaintiff "didn't mention [voices] at [the] E[ligibility] C[enter]," but told him that she did "mention[] this" and said, "'He didn't put it on there.'" (*Id.*).

Plaintiff continued to visit MHMRA from January 2009 through May 2009. (Tr. at 332-375).  On January 12, 2009, Plaintiff complained of "mood swings, racing thoughts, difficulty sleeping, poor appetite, [decreased] energy," and hallucinations.  (Tr. at 360).  Although she reported that her medications were "not working for her," she did not complain of any side effects from them.  (Tr. at 360, 372).  From January to April, her progress notes indicate that MHRMA staff educated Plaintiff on the importance of "managing daily responsibilities" and

---

[18] The GAF scale is used to rate an individual's "overall psychological functioning." AMERICAN PSYCHIATRIC INSTITUTE, DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS ("DSM-IV") 32 (4th ed. 1994).  The scale ascribes a numeric range from "1" ("persistent danger of severely hurting self or others") to "100" ("superior functioning") as a way of categorizing a patient's emotional status. *See id.*  A GAF of 31-40 is extremely low, and "indicates [s]ome impairment in reality testing or communication . . . [or] major impairment in reality testing or communication . . . [or] major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood." *Id.*

[19] "The Eligibility Center of MHMRA Harris County is the clinic to apply for mental health services for all Harris County residents."  MHMRA of Harris County, http://www.mhmraharris.org/Eligibility-Center.asp (last visited February 2, 2012).

"planning a daily schedule, as well as "coping techniques."  (Tr. at 364, 366, 368).  Hudson "verbalized [that] she could watch TV, listen to a radio, or take a walk instead of isolating herself in the home."  (Tr. at 368, 364, 336).

On February 6, 2009, Plaintiff saw Dr. Wiley again.  He repeated Plaintiff's diagnosis of major depression without psychosis, and reported that she experienced "motor retardation," and "appear[ed] very child-like."  (Tr. at 357).  Hudson's next visit with Dr. Wiley was the following month.  (Tr. at 354).  At that time, Dr. Wiley determined that Plaintiff's "depression symptoms [were] due to" her "non-complian[ce] with" medications.  (*Id.*).  At this visit, he found Plaintiff's motor activity to be normal.  (Tr. at 353).  The next time Plaintiff went to MHMRA was on April 6, 2009, to have her medication prescriptions refilled.  (Tr. at 350-51).  Hudson complained then of "occasional" hallucinations, and reported that she did not experience any side effects from her medications.  (Tr. at 351).  In fact, Plaintiff reported that her medications were "effective" and that they "help[ed] her not to cry so much."  (*Id.*).

Hudson's next appointment with Dr. Wiley was on May 5, 2009.  At that appointment, Dr. Wiley noted that Plaintiff expressed "passive" thoughts about suicide, but that she had "no plan."  (Tr. at 430).  Dr. Wiley reported that Plaintiff had been denied social security disability insurance, but that she was "focused on getting disability that others have gotten."  (Tr. at 340, 430).  He added that Hudson "seems to know what she can and can't say."  (*Id.*).  On that day, Dr. Wiley changed Plaintiff's diagnosis to major depression with psychosis.  (*Id.*; Tr. at 333, 341).  Inexplicably, the next time Plaintiff saw Dr. Wiley, on June 4, 2009, she "wanted to know why she [wa]sn't [diagnosed] with psychotic features."  (Tr. at 424).  Hudson "fe[lt] [that] her cousins [] with the same problems" were "'labeled with psychotic features,'" and they both received disability benefits.  (Tr. at 424).  She reported "hearing things and seeing things and

14

hallucinating." *Id.*  Dr. Wiley remarked that Hudson "seems very focused on what she wants to discuss[,] but report[s] poor concentration."  (*Id.*).  Nevertheless, Dr. Wiley authorized a new prescription for Risperidal,[20] and instructed Hudson to continue taking Effexor, Vistaril, and Trazadone.  (Tr. at 425).  He also advised her of the interactions that these medications could have with Tramadol, which had been prescribed by her primary care physician.  (*Id.*).

On July 10, 2009, Plaintiff visited MHMRA for "med[ical] monitoring" and a medication "refill/extension."  (Tr. at 414).  Her diagnosis was listed as major depression with psychotic features.  (Tr. at 416, 419).  She reported no side effects from her medications, but said that she had been without medicine for two weeks.  (Tr. at 414, 416).  Plaintiff also stated that she felt "unable to deal with [the] stressors of full time work," but that she "would like to work part-time in [the] near future and eventually full-time."  (Tr. at 417).  The next time she saw Dr. Wiley was July 28, 2009.  (Tr. at 411).  During that visit, Hudson reported hallucinations, even though she had been taking her medications as prescribed.  (Tr. at 411).  Hudson also told Dr. Wiley that her sister was "taking her to a shelter" that day.  (Tr. at 411).

There are records from the Acres Home Community Health Center ("health center"), which Plaintiff visited from February through July of 2009.  (Tr. at 301-02, 391-409).  Plaintiff first sought treatment there, on February 13, 2009, "for lower back pain."  (Tr. at 301).  The attending physician, Larry Butcher, M.D. ("Dr. Butcher") described Plaintiff as having a history of "chronic back pain with spasms, [and] Bipolar Depression."  (*Id.*).  Dr. Butcher's exam revealed "paraspinal[21] tenderness" and he prescribed Tramadol for Plaintiff.  (Tr. at 302).  On March 31, 2009, Hudson returned to the health center complaining of back pain and asking for a

---

[20] Risperidal "is used to treat the symptoms of schizophrenia."  U.S. National Library of Medicine, http://www.ncbi.nlm.nih.gov/pubmedhealth/PMH0000944/ (last visited February 4, 2012).
[21] "Paraspinal" means "adjacent to the spinal column."  Merriam-Webster, http://www.merriam-webster.com/medical/paraspinal (last visited February 3, 2012).

refill of her medications.    (Tr. at 401-03).    Jyoti Behl, M.D. prescribed Tramadol, Cyclobezaprine,[22] and Gabapentin.[23]   (Tr. at 401, 403).   On May 6, 2009, Plaintiff appeared at the clinic and reported that she continued to suffer from lower back pain, but that it was "bearable."  (Tr. at 397).

On March 2, 2009, Plaintiff saw Farzana N. Sahi, M.D. ("Dr. Sahi") of the Texas Department of Assistive and Rehabilitation Services ("DARS") for a consulting exam.   (Tr. at 303).   Dr. Sahi noted Plaintiff's history of "bipolar/schizophrenia" and reported that she appeared confused.  (*Id.*).  Plaintiff complained of back pain, but after examining her, Dr. Sahi determined Hudson to have "no physical limitation[s]."  (Tr. at 306).   In addition, an X-ray taken that day showed there to be "no spondylolisthesis"[24] and only "[m]arginal spurring."  (Tr. at 307).

On March 9, 2009, a DARS psychologist, Steven J. Rubenzer, Ph.D. ("Dr. Rubenzer"), evaluated Plaintiff.   (Tr. at 309).   During that exam, Dr. Rubenzer noted that Plaintiff "[a]ppeared to be putting great effort into presenting herself as mentally ill."  (Tr. at 310).   He diagnosed Hudson as "malingering" and determined that he was "[u]nable to assess" her current GAF, because of her "unreliability."  (*Id.*).  Dr. Rubenzer concluded,

> Ms. Hudson presented in [a] dramatic, implausible manner during this evaluation
> from the very beginning, acting terrified of a typical office chair.  She repeated[ly]
> apologized in a child-like manner and when she was later directed to remain on task
> or to answer the question she was asked, she accused the examiner of being mean.
> Ms. Hudson also presented as being afraid of the examiner's notebook computer,
> so the Word Memory Test could not be administered.   However, Ms. Hudson did
> complete the M-FAST, on which she obtained a score of 14.   A score above 6 is

---

[22] Cyclobezaprine is "a muscle relaxant" that "is used with rest, physical therapy, and other measures to relax muscles and relieve pain and discomfort caused by strains, sprains, and other muscle injuries."  .  U.S. National Library of Medicine, http://www.ncbi.nlm.nih.gov/pubmedhealth/PMH0000699/ (last visited February 4, 2012).

[23] Gabapentin is "used to help control certain types of seizures" and "to relieve the pain of postherpetic neuralgia (PHN; the burning, stabbing pain or aches that may last for months or years after an attack of shingles)."  U.S. National Library of Medicine, http://www.ncbi.nlm.nih.gov/pubmedhealth/PMH0000940/ (last visited February 4, 2012).

[24] "Spondylolisthesis" is "the partial forward dislocation of one vertebra over the one below it."  MOSBY'S at 1528.

suggestive of feigning.  This was despite being warned of the importance of being completely honest and putting forth her best effort … Unfortunately, it is not possible to determine a person's actual mental condition in a brief assessment when they do not present in a valid manner.  In addition, Ms. Hudson apparently misrepresented her use of street drugs (inferred from positive urine test) to MHMRA and this examiner.  As always, DARS personnel are encouraged to obtain and review all previous psychiatric and school records.

(Tr. at 311).

On March 18, 2009, Plaintiff saw John Ferguson, Ph.D ("Dr. Ferguson"), of the Texas Department of Disability Services, for a "[p]sychiatric [r]eview."  (Tr. at 313.  Dr. Ferguson found Plaintiff to suffer from a major depressive disorder.  (Tr. at 316).  He also determined that Hudson had "moderate" limitations in her daily activities, "moderate" difficulties in "maintaining social functioning," and "mild" difficulties in "maintaining concentration, persistence, or pace."  (Tr. at 323).  Dr. Ferguson concluded that Plaintiff's symptoms "do not wholly compromise her ability to function appropriately, effectively, or independently."  (Tr. at 325).

### Educational Background, Work History, and Present Age

At the time of the administrative hearing, Hudson was 48 years old.  (Tr. at 29).  She had received a four-year college degree in criminal justice.  (Tr. at 30, 60).  She also had many credit hours toward a master's degree in social work, but she never completed the program.  (Tr. at 30, 60).  Hudson had prior work experience as a teacher's aide with HISD, but she testified that she could not "remember most of" her work history."  (Tr. at 30, 59-60).  Hudson was also a self-employed mortgage broker from 2003 to 2007.  (Tr. at 138).

### Subjective Complaints

At the hearing before the ALJ, Hudson testified that she lives with her sister, but that she is unable to help "with the upkeep of the house."  (Tr. at 31-32).  Plaintiff told the ALJ that,

17

although she had a driver's license, she was "too nervous" to drive.  (*Id.*).  Hudson stated that she

stopped driving in 2007, because "[s]omething happened," but she could not recall what that

"something" was.  (*Id.*).

Hudson testified that she stopped working in 2006 or 2007, because the school where she

taught "said they didn't need [her] kind of teaching no more."  (*Id.*).  According to Plaintiff, the

school said she "need[ed] to be on medicine."  (Tr. at 33).  Plaintiff stated that she has tried to

return to work, but that

> My mind something is wrong.  Something happened.  I can't remember anything
> and I try hard.  I can't remember one day to the next, like what I did yesterday.
> And … [my] back hurts and my legs and something is so wrong … Something is
> wrong with my mind now … And the medicines keep me droggy [phonetic].  I sit
> up and then I hurt and I go back to sleep.

(Tr. at 33).  The ALJ asked Plaintiff to explain what was "wrong with [her] mind."  (Tr. at

33).  Plaintiff responded as follows:

> I see things.  I hear things that are not there.  I do things that's [sic] not normal and
> the doctors think maybe they got to put me in the hospital if it doesn't stop.  I think
> people are on me trying to hurt me … They get on me and they try to hurt me when
> I come outside … I stay inside so they don't hurt me.  They don't hurt me no more
> so they can't never get on me again.

(Tr. at 34).  Plaintiff reported that her medications "take the edge off," but that they do not

alleviate her symptoms.  (Tr. at 35).  Plaintiff testified that her doctor helps only "somewhat."

Plaintiff told the ALJ,

> [Sometimes] I wish I wasn't here because it don't seem like it's going to stop.  I
> want to be like I was.  I worked all my life and I want to be back normal to where I
> don't hear things, I don't see things, I don't pull hair off of me, trying to get people
> off of me and things.  I want to be normal like you.

(*Id.*).  Plaintiff also testified that she has back pain, which renders her unable to move.  (*Id.*).

Hudson testified that when she "wake[s] up," she "ha[s] to wait and try to see if [her] medicine

will work …. before [she] can get up."  (*Id.*).  Hudson reported that the wait sometimes lasts "15-

18

20 minutes in the mornings and then throughout the day if [she] sit[s] down for long periods."
(Tr. at 37).  Plaintiff told the ALJ that her back pain medicine only "make[s] [the pain] mild[er],"
but that it also makes her "groggy."  (Tr. at 37).

The ALJ asked Hudson about her daily activities, and she repeated that she does not help
with the cleaning, cooking, or laundry.  (Tr. at 38).  Plaintiff also stated that she does not go
outside.  (*Id.*).  Instead, she "lay[s] around the whole day," because she is "sleepy and in pain."
(*Id.*).  Hudson stated that she had no hobbies or interests, and that she slept well only on "some
nights."  (Tr. at 39).  Other nights she has to "take [her] medicine."  (*Id.*).  Plaintiff reported that
she does not visit other relatives who live nearby and that she attends church only "once or twice
a year."  (*Id.*).

Plaintiff acknowledged that she had a history of substance abuse, but reported that she
had not used any alcohol or illegal substances recently.  (Tr. at 39).  Hudson also testified that
she receives counseling for her addictions.  (Tr. at 39-40).  The ALJ asked Plaintiff about the
"evidence in the record that [she] [] use[d] marijuana as recently as 2008."  (Tr. at 40)  Plaintiff
responded that she had no recollection of that, and that she could not remember when she last
used marijuana.  (Tr. at 40).

When questioned by her attorney, Plaintiff reported that her weight had fluctuated over
the last year and that she has "no appetite most of the time."  (Tr. at 41).  She reported taking
"[e]leven different medications" at the moment.  (*Id.*).  She also stated that her blood pressure
rises and falls, but that it is usually high.  (Tr. at 42).

### Expert Testimony

At the hearing, the ALJ also heard from a psychiatrist, Dr. Nancy Tarrand, who testified
as a medical expert witness.  (Tr. at 43).  Dr. Tarrand testified that "there are a number of

conflicts in the record that make it difficult to come to a precise understanding of her psychiatric difficulties." (Tr. at 44). Dr. Tarrand explained that,

> [Hudson] has a number of different diagnoses. She has presented in a number of different ways to different people at different times. There are numerous mentions in the record of the possibility of malingering or seeking of secondary gain and when I combine all that it makes it difficult to really come to an accurate assessment of her.

(Tr. at 44). Dr. Tarrand acknowledged that Plaintiff's current diagnosis is "major depressive disorder with psychosis," but she stated further that, Hudson's "treating clinicians …. seem at times to question that diagnosis or question her whole presentation and the validity of it." (Tr. at 45). Dr. Tarrand then remarked,

> There are some things in the record that would make one wonder a little bit whether her entire presentation is maybe perhaps embellished a bit for the purpose of seeking benefits. That was certainly the opinion of the consultative examiner. And at times MHMRA has reflected that concern in their own notes. But they continue to give her lots of medication. So on some level they certainly are taking it as a true mental illness.

(*Id.*). In sum, Dr. Tarrand did find Hudson to have "some sort of psychiatric disturbance for which she's receiving treatment," and she added that, while the symptoms Plaintiff reports support a finding that her disturbance is "severe," she "question[s]" the "validity of those symptoms." (*Id.*). With that statement, Dr. Tarrand concluded that if Hudson was "truly as psychotic as she claims to be," she would meet the criteria for the 12.04(c) listing. (Tr. at 46, 48). The ALJ then asked Dr. Tarrand to explain her statement, and the witness responded as follows:

> The depressive symptoms that she has reported … would be anhedonia,[25] problems with appetite, [and] problems with sleep. There are psycho-motor changes noted from time to time. At times she has described feelings of worthlessness and problems with her energy. Concentration difficulties are variable. At times she reports para-suicidal thoughts and she also reports at this time almost continuous,

---

[25] "Anhedonia" is "the inability to feel pleasure or happiness in response to experiences that are ordinarily pleasurable. It is often a characteristic of major depression." MOSBY'S at 93.

both visual and auditory[,] hallucinations. Visual hallucinations are relatively uncommon in psychiatric illness that is not induced by substances or some other form of organic mental disorder.  So the constant visual hallucinations are a little unusual, more than a little for a major depressive disorder with psychosis.  She seemed to completely deny … psychotic symptoms … when she was seen in the Harris County Jail. That's in the fall of 2008 so about a year ago. And they diagnosed her with an anxiety disorder, possibly a personality disorder. She did seem a little grandiose at that time. And then somewhere in the course of that year she has begun reporting almost constant hallucinations which seem to be completely unaffected by medication. Again a little unusual…. And perhaps she has a depression that has worsened with that sort of severity but typically depression with psychosis doesn't exactly follow this course.  So it, it's a little bit confusing.

(Tr. at 46-47).   The ALJ then asked Dr. Tarrand for her opinion on Hudson's functional limitations.  (Tr. at 47).  Dr. Tarrand told the ALJ that she had "a hard time from the record getting a picture of how [Plaintiff] functions."  (*Id*.).  Dr. Tarrand stated that,

The record seems to indicate that she lives with her sister, [and] that she and her sister have some conflict. That her sister has been very interested in the claimant getting benefits. I suppose for the reason of having her be able to move out.  Other than that the record doesn't really tell us too much about how she's managing day-to-day.  She, on the one hand, presents as being very psychotic but on the other hand seems to be able to focus very intently on specifics regarding her medical record that would be important in terms of trying to validate the diagnosis of depression with psychosis and seems to be very focused upon any benefits that might accrue because of that diagnosis. So typically people who are truly psychotic to the point of hallucinating constantly are not that able to focus on those kinds of … details.

(Tr. at 47).

Plaintiff's attorney, Mr. Makris, then had an opportunity to question Dr. Tarrand.  (*Id*.). He first asked the psychiatrist whether she felt that a person, such as Plaintiff, with a GAF score in the 40s "would have a great deal of difficulty functioning in a work type environment.  (Tr. at 48).  Dr. Tarrand responded that,

We can't necessarily conclude from a score in the 40s that that particular person is not able to go to work or not able to function at work or not able to hold a job. There are just too many different ways to arrive at different GAF scores and different people are able to function with different levels of symptoms.

(Tr. at 49). Dr. Tarrand continued that, despite the fact that a GAF score of 41 - 50 is defined as "serious symptoms or serious impairment in social or occupational or school functioning," the score "doesn't really tell us what a person is able to do… [i]t's really vauge." (Tr. at 50). In discussing the side effects of Plaintiff's medications, Mr. Makris asked Dr. Tarrand whether Hudson's medicines caused her drowsiness or memory loss. Dr. Tarrand answered,

> At times [Hudson] denies side effects from her medication which I found to be unusual for someone who is taking so much medication. At times she's also been noted to not be compliant with her medication. But certainly memory complaints are in here and we can probably find drowsiness at some point.

(Tr. at 51). Later, Dr. Tarrand reported that, although the medications could cause "some drowsiness," it was "something … one could become accustomed to. Particularly if things like a muscle relaxant and the antipsychotic medication were taken at night." (Tr. at 53). In discussing Plaintiff's functional limitations, Dr. Tarrand stated the following,

> I think th[e] entire assessment of her functional limitations depends on whether or not one takes her symptoms at face value. If they, if one agrees that she has a psychotic depression almost completely unresponsive to medication then a number of these things would be at a much higher level. For example performing activities within a schedule, maintaining regular attendance, completing a workday and workweek without interruptions from psychologically based symptoms. All of those things would certainly be markedly limited. If one believes that she is not having psychosis to the degree that she says and that she's essentially malingering then I don't know what the basis would be for any limitations.

(Tr. at 54). Finally, Dr. Tarrand agreed with Mr. Makris that if Hudson's diagnoses were accurate, it would be "reasonable" to appoint a representative payee. (Tr. at 56-57).

The ALJ also heard from Mr. Stanfill, a vocational expert witness. (Tr. at 58). Mr. Stanfill testified that Hudson's prior work as a teacher's aide was "light" and "skilled." (Tr. at 60). Her past work as a mortgage broker is considered "sedentary" and "skilled." Mr. Stanfill

added that there were some years in Hudson's work history "with no earnings." (*Id.*).  The ALJ

then posed a hypothetical question to Mr. Stanfill. (*Id.*).  Their exchange is set out below:

> Q      Assume a person of Ms. Hudson's age, education and work experience who
> is able to do the full range of light work that requires understanding, remembering
> and carrying out short, simple instructions and with limited contact with the general
> public and co-workers and with tasks that are repetitive in nature.  Could such an
> individual perform Ms. Hudson's past work as it was actually performed or as it is
> customarily performed per the DOT?
> A      No, they could not, Judge.
> Q      Please explain that.
> A      The past work was at least complex in nature, involved heavy public contact
> with either students or the public in general….
> Q      I've got another hypothetical for you.  Again assume a person of Ms.
> Hudson's age, education and work experience who can perform light-level work,
> the full range there of that requires understanding, remembering and carrying out
> short, simple instructions and with limited contact with the general public and co-
> workers and with tasks that are repetitive in nature.  Are there any jobs in the
> national or regional economy that such a person could perform?
> A      There are.

(Tr. at 61).  Mr. Stanfill then testified that such a hypothetical individual could perform work as

an "office cleaner," and that "there are approximately 2,500" positions available locally, and

"380,000 in the national economy."  (Tr. at 61-62).  That person could also work as a "laundry

press operator," and there are 900 of those positions available locally, and 200,000 of them

available nationally.  (Tr. at 62).  In addition, she could work as a "small products assembler,"

with 1,100 positions available in the Houston region, and 205,000 available in the national

economy.  (*Id.*).  According to Mr. Stanfill, these positions are appropriate because they "are all

unskilled jobs, [with] simple, repetitive tasks," that do not require "direct contact with the

public."  (*Id.*).  Mr. Stanfill added that, "There would be co-workers in the area[,] but they would

not be reliant upon each other."  (*Id.*).

Plaintiff's attorney then questioned Mr. Stanfill, as follows:

Q       Sir, if an individual were to, if His Honor were to find the testimony of the
claimant credible … would those limitations preclude or erode any of the jobs that
you identified?
A       Yes, taken at face value it would.  Yes.
Q       Okay.  And how would it affect, would it preclude or erode?
A       It would eliminate, yes.

(Tr. at 65-66).  With that answer, the hearing ended.  (*Id*.).

### *The ALJ's Decision*

 Following the hearing, the ALJ made written findings on the evidence.  (Tr. at 11-20).
From his review of the record, he determined that Hudson suffers from the "severe impairments"
of "affective and mood disorders" and "disorder of the back with chronic pain." (Tr. at 13).
However, he wrote that, "[a]fter careful consideration of the entire record," he found that Hudson
did not have "an impairment or combination of impairments that meets or medically equals one
of the listed impairments."  (*Id*.).  The ALJ described Plaintiff as having "the residual functional
capacity to perform light work … with understanding, remembering, and carrying out short,
simple instructions; with limited contact with the general public and co-workers; and with tasks
that are repetitive in nature."  (Tr. at 15).  The ALJ also found that "there are jobs that exist in
significant numbers in the national economy that the claimant can perform."  (Tr. at 18).   With
that conclusion, the ALJ denied Hudson's application for benefits. (Tr. at 19).

Before this court, Hudson claims that the ALJ failed to "conduct a meaningful evaluation
of her credibility."  (Tr. at 8, 10).  Hudson next contends that the ALJ failed to consider and
discuss the side effects from her medications on her ability to work.  (*Id*. at 4).  Hudson also
maintains that the ALJ failed to consider the low Global Assessment Functioning ("GAF")
scores that her treating and examining physicians assigned to her.  (*Id*. at 5, 7).  Plaintiff argues
further that the vocational expert's opinion does not constitute substantial evidence because it

relied on a flawed hypothetical question.  (*Id.* at 12).  Finally, Hudson contends that the ALJ

erred in failing to consider whether she is "capable of *maintaining*" employment.  (*Id.* at 13)

(additional emphasis omitted).   Defendant insists, however, that "the ALJ's residual functional

capacity assessment followed the regulatory requirements and that substantial evidence supports

his findings."  (Defendant's Motion at 6).

It is well settled that judicial review of the Commissioner's decision is limited to a

determination of whether it is supported by substantial evidence, and whether the ALJ applied

the proper legal standards in making it.  *See Myers*, 238 F.3d at 619; *Newton*, 209 F.3d at 452

(citing *Brown*, 192 F.3d at 496).  Further, a finding of "no substantial evidence" is proper only if

there are no credible medical findings or evidentiary choices that support the ALJ's decision.

*See Johnson*, 864 F.2d at 343-44 (quoting *Hames*, 707 F.2d at 164).

*Plaintiff's Credibility*

Plaintiff alleges that the ALJ failed to assess her credibility properly.  (Plaintiff's Motion

8-10).  More specifically, Hudson argues that the ALJ failed to consider the limitations that her

"chronic hallucinations" imposed, and that he did not acknowledge evidence that was favorable

to her.  (*Id.* at 8-12).   Among the items of favorable evidence that Plaintiff points to are her

statements that "the [SSI] check was only to help [her] get better"; that "she wants to work '[i]f

[she] can get better; that "[s]he 'would like to work part-time in [the] near future and eventually

full time'"; and that she "feels she is unable to deal with [the] stressors of full-time work at this

time."  (*Id.* at 8-9). Plaintiff also emphasizes that the ALJ "stated that [she] first sought treatment

from MHMRA in September 2008," but that, in fact, she first received treatment there in April

2007.  (*Id.* at 9).  Finally, Plaintiff points out that the ALJ did not mention Dr. Tarrand's

testimony that she "would meet [the] 12.04(c) [listing] if she were as impaired as she has

consistently presented through the medical record." (*Id*. at 9).  In response , Defendant argues that "the ALJ reasonably discounted Plaintiff's subjective complaints given the multiple reports in the medical record that Plaintiff was an unreliable historian, a malingerer who appeared to be motivated by secondary gain, and that she denied illicit drug use despite a positive urine test to the contrary." (Defendant's Reply at 2).

In this instance, the ALJ considered Plaintiff's credibility in conjunction with his evaluation of her residual functional capacity.  (Tr. at 15-16).  He observed that "the medical record contains a considerable number of clinical findings that [are] inconsistent with a claim of an inability to perform any sustained work activity."  (Tr. at 16).  In making this determination, the ALJ remarked that Plaintiff "testified that she see things and hears things that are not there." (Tr. at 15-16).  He also referenced Hudson's report of "hearing voices" in December 2008.  (Tr. at 16).  Despite these reports, however, the ALJ based his credibility determination on a number of other items in the record.  First, he cited the report from Plaintiff's treating physician, in June 2009, that Hudson "wanted to know why she wasn't diagnosed with psychotic features," and that she "was very focused on having her attorney advise her of what to do and especially needing a diagnosis of 'psychotic features.'"  (Tr. at 16).  The ALJ also discussed Plaintiff's December 2008 visit to MHMRA when the clinician remarked that Hudson "like[d] to throw the word 'bipolar' around though [she] doesn't report any particular symptoms that meet the criteria."  (Tr. at 16).  In addition, the ALJ noted that, in March 2009, Dr. Rubenzer concluded that Plaintiff was "malingering," and that she "presented herself in a dramatic, implausible manner."   (Tr. at 16).  The ALJ further observed that Plaintiff received "a score of 14" on the M-FAST test that Dr. Rubenzer administered, which was "suggestive of possible feigning."  (Tr. at 17).  The ALJ also stated that Hudson "misrepresented her use of street drugs."  (*Id*.).  Finally, the ALJ

concluded that "[t]he claimant's credibility is further undermined by her report of being on probation until 2010 for prescription fraud." (*Id.*).

In discussing the veracity of Plaintiff's complaints of lower back pain, the ALJ recognized that an x-ray of her lumbar spine did reveal "marginal spurring" and "vascular calcifications … at the pelvis." (Tr. at 17). However, he also noted that "there was no acute fracture or dislocation and the vertebral body heights and interspaces were well maintained." (*Id.*). In addition, the ALJ discussed the February 2009 examination by Plaintiff's treating source, which showed "no spinal tenderness, negative straight leg raise (bilaterally), 5 out [of] 5 motor strength (bilaterally upper and lower extremities), and intact sensory." (*Id.*). Finally, he observed that "in July 2009, the treating physician noted that the examinations and assessments of the claimant's lower back showed nothing significant." (*Id.*).

The law is clear that the ALJ must determine a claimant's residual functional capacity in light of any existing impairment. *Ripley*, 67 F.3d at 557 (citing 20 C.F.R. § 404.1546). To make this determination, the ALJ "must consider a claimant's subjective symptoms as well as objective medical evidence." *Wingo v. Bowen*, 852 F.2d 827, 830 (5th Cir. 1988). If the ALJ rejects a claimant's subjective complaints, the reasons for so doing must be made clear. *Falco v. Shalala*, 27 F.3d 160, 164 (5th Cir. 1994). For example, he may find that the claimant's subjective complaints were "exaggerated and not credible," or he may find the medical evidence to be "more persuasive than the claimant's own testimony." *Id.* ). "The ALJ must consider subjective evidence of pain, ... but it is within his discretion to determine the pain's disabling nature." *Herrera v. Astrue*, 406 Fed. Appx. 899, 905 (5th Cir. 2010) (citing *Wren v. Sullivan,* 925 F.2d 123, 128 (5th Cir.1991)). These credibility determinations "are precisely the kinds of determinations that the ALJ is best positioned to make." *Id.* As such, they are "entitled to

considerable judicial deference."  *Haywood v. Sullivan*, 888 F.2d 1463, 1470 (5th Cir. 1989); *James v. Bowen*, 793 F.2d 702, 706 (5th Cir. 1986).

In this instance, the ALJ based his determination of Hudson's credibility on a number of reports from different clinicians and doctors who reported exaggerations, secondary motivations, and inconsistencies between Plaintiff's allegations and her symptoms.  (Tr. at 16-17).  It seems the ALJ made these findings not to support his assessment of her RFC, but to explain the reason that he questioned her credibility. (Tr. at 16-17).   In that context then, it is irrelevant that he failed to consider the "limitations" of Hudson's alleged hallucinations, or that he omitted certain statements favorable to her in his written findings.  The ALJ is clearly permitted to reject Plaintiff's complaints if he finds them to lack credibility, and to rely on other sources that support his findings.  *Falco*, 27 F.3d at 164; *Herrera v. Astrue*, 406 Fed. Appx. at 905 (noting that although the "ALJ must consider subjective evidence of pain, ... it is within his discretion to determine the pain's disabling nature").   Here, the ALJ has satisfied his burden to explain his reasons for discrediting Plaintiff's subjective complaints of limitations, and he has supported his decision with substantial evidence.  *See Falco*, 27 F.3d at 164; *Haywood*, 888 F.2d at 1470; *Wingo*, 852 F.2d at 830.  There is no reason to disturb those findings.

*Side-effects of medication*

Plaintiff complains that "the ALJ fails entirely to conduct any of the required side-effects analysis in his decision."  (Plaintiff's Motion at 5).  Hudson points out that, at the hearing, she told the ALJ that she suffered from drowsiness because of her medications, and that she "sleep[s] most of the time."  (*Id*.).   She also underscores Dr. Tarrand's testimony that her prescriptions "would cause some degree of drowsiness." (*Id*.). Defendant counters this argument by noting that the "medical record undermines Plaintiff's claim that she experienced severe, medicinal side

effects." (Defendant's Reply at 2). Further, the Commissioner argues that "Plaintiff provided ample reason to doubt not only her subjective complaints of pain, drowsiness, and other symptoms, but her overall veracity as well." (*Id*.).

This circuit has recognized that, "[u]nder the regulations, the Commissioner is required to consider the "type, dosage, effectiveness, and side effects of any medication [the claimant] take[s] or ha[s] taken to alleviate any pain or other symptoms." *Crowley v. Apfel*, 197 F.3d 194, 199 (5th Cir. 1994) (citing 20 C.F.R. § 404.1529(c)(3)(iv)) (alterations in original). Side-effects from medication are deemed nonexertional limitations, "which may have a disabling effect" on a claimant. *See James v. Bowen*, 793 F.2d 702, 705 (5th Cir. 1986); *and see Crowley*, 197 F.3d at 199; *Vaughan v. Shalala*, 58 F.3d 129, 132 (5th Cir. 1995). To establish whether such a disabling effect exists, an ALJ must consider the claimant's subjective complaints "about the intensity, persistence, and limiting effects of [his] symptoms, and . . . will evaluate [his] statements in relation to the objective medical evidence and other evidence." 20 C.F.R. § 404.1529(c)(4); *and see Falco v. Shalala*, 27 F.3d 160, 163 (5th Cir. 1994) ("[T]he law requires the ALJ to make affirmative findings regarding a claimant's subjective complaints."). Indeed, "[t]he Act, regulations and case law mandate that . . . subjective complaints be corroborated, at least in part, by objective medical findings." *Harrell v. Bowen*, 862 F.2d 471, 481 (5th Cir. 1988). For this reason, an ALJ may reject a claimant's subjective complaints, so long as the reasons for so doing are made clear. *Falco*, 27 F.3d at 164.

Here, the medical record reflects that, on at least three occasions, in January, February, and July of 2009, Plaintiff reported having no side effects from her medications. (Tr. at 351, 360, 372, 414, 416). At other times, it appears that Plaintiff did not take her medications properly. (Tr. at 232, 354). In addition, at the hearing, the ALJ acknowledged the exhibit listing

Plaintiff's eleven medications and he heard extensive testimony from Dr. Tarrand in which she discussed the potential side effects from each of them.  (Tr. at 26, 51-53).  Dr. Tarrand concluded that, although the medications could cause "some drowsiness," that [] was "something … one could become accustomed to.  Particularly if things like a muscle relaxant and the antipsychotic medication were taken at night."  (Tr. at 53).  It is clear then that the ALJ was aware of the potential side effects from Plaintiff's prescription drug regimen.  In his decision, the ALJ "evaluat[ed []] all the evidence of the record" and "assess[ed] [] [Plaintiff's] allegations." (Tr. at 18).  As with her other subjective complaints, however, the ALJ found them to be unbelievable. Because the ALJ made clear his reasons for that decision, and because there is substantial evidence to support that finding, it need not be disturbed.

*Weight Given to the Opinions of Treating Physicians*

Plaintiff complains that the ALJ rejected the treating source's "opinions," which assessed Plaintiff's GAF scores in the 40-45 range.  (Plaintiff's Motion at 5-8) (citing Tr. 388, 233, 380). She also argues that the "ALJ's failure to pay attention or rejection of findings in medical records showing long and bizarre episodes of decompensation is not explained."  (*Id*. at 7).  Finally, Hudson complains that the ALJ did not conduct the "detailed analysis" that is required when rejecting a treating physician's opinion.  (*Id*. at 8).  In response, Defendant points out that "[b]y 'treating physician's opinion,' Plaintiff apparently means her … [GAF] Scale scores, as opposed to any medical opinion that she was actually disabled."  (Defendant's Reply at 3).  The Commissioner maintains that Hudson's GAF "scores were neither reliable – because Plaintiff was a malingerer – nor indicative of a disabling condition, even if accepted at face value, since GAF Scale scores are merely 'snapshots' of a patient's mental state at the time of examination." (*Id*. at 3).

The SSA regulations require the Commissioner to evaluate every medical opinion that is received in evidence on a claimant's behalf.   20 C.F.R. § 404.1527(d).   Generally, more weight is given to the opinion of a treating physician than to those given by other medical professionals, including examining physicians and medical expert witnesses.   *Myers v. Apfel*, 238 F.3d 617, 621 (5th Cir. 2001); *Loza v. Apfel*, 219 F.3d 378, 381, 354 (5th Cir. 2000); *Greenspan v. Shalala*, 38 F.3d 232, 237; 20 C.F.R. § 404.1527(d)(2).   A "treating" physician is one "who has provided medical treatment or evaluation and "who has, or has had, an ongoing treatment relationship with" the claimant."   *Hernandez v. Astrue*, 278 Fed. Appx. 333, 338 n. 4 (5th Cir. 2008) (citing 20 C.F.R. § 404.1502).   It is well-settled that an ALJ cannot reject the opinion of a treating physician without "good cause" to do so.   *See* 20 C.F.R. § 404.1527(d); *Myers*, 238 F.3d at 621; *Loza*, 219 F.3d at 395; *Newton*, 209 F.3d at 455–56.   "Good cause" may exist when the treating physician's statements are "brief and conclusory, not supported by medically acceptable clinical laboratory diagnostic techniques, or otherwise unsupported by the evidence."   *Myers*, 238 F.3d at 62l; *see Greenspan*, 38 F.3d at 237; *see also Newton*, 209 F.3d at 456.

Here, Plaintiff argues that the relevant regulations require the ALJ to give deference to "the medical opinion implicit in [her low] GAF scores," as well as the "findings showing long and bizarre episodes of decompensation."   (Plaintiff's Motion at 7).   However, she has not pointed to an opinion from any particular physician.   And, while Plaintiff cites three records that reflect "low GAF scores," there are no records that detail "long and bizarre episodes of decompensation."   Instead, Plaintiff relies on Dr. Kapoor's assessment of her GAF as 42, on April 16, 2007; Dr. Sadberry's assessment of her GAF as 45, on September 27, 2008; and Dr. Kopecky's assessment of her GAF as 40, on December 5, 2008.   (Tr. at 388, 233, 380).   But from the available evidence, it appears that Hudson saw each of these doctors only once.   (Tr. at

233, 380, 388).  With such limited treatment, the opinions from those doctors are not entitled to controlling weight.  *Hernandez v. Astrue*, 278 Fed. Appx. 333, 338 n. 4 (5th Cir. 2008) (citing 20 C.F.R. § 404.1502); *see also Borne v. Astrue*, 2010 WL 3303804, at * 10 (E.D. La. 2010) (noting that, because the doctor saw the claimant only once, the physician was "*not* a treating physician as defined by the Commissioner's regulations and his opinion would *not* be accorded [] controlling weight." (emphasis in original))   Similarly, because Plaintiff saw Drs. Kapoor, Sadberry, and Kopecky only one time each, the ALJ was not required to ascribe controlling weight to their opinions.  *See id.*

On the other hand, Dr. Wiley treated Hudson for her mental health issues from December 2008 through July 2009.  (Tr. at 256-58, 333, 340-41, 353-357, 411, 424-25, 430).  For that reason, the ALJ properly acknowledged him as her "treating physician," and discussed his opinion, in detail.  (Tr. at 16).  The ALJ emphasized, for example, Dr. Wiley's findings that Hudson wanted a diagnosis of "psychotic features," and that she "seemed very focused on what she wanted to discuss[,] but reported poor concentration."  (Tr. at 16).  Moreover, at the hearing, Dr. Tarrand described GAF scores as a "vague" measurement that does not indicate "what a person is able to do."  (Tr. at 50).  Finally, Dr. Rubenzer declined to assess Plaintiff's GAF score, because Hudson "[a]ppeared to be putting great effort into presenting herself as mentally ill."  (Tr. at 310).  For these reasons, there is "good cause" to give less than controlling weight to Plaintiff's GAF scores in this instance.  *See* 20 C.F.R. § 404.1527(d); *Myers*, 238 F.3d at 621; *Loza*, 219 F.3d at 395; *Newton*, 209 F.3d at 455–56. On this point, then, Plaintiff presents no basis for remand.

Hudson also contends that the ALJ "failed to seek clarification" of the opinions "showing long and bizarre episodes of decompensation."  (Plaintiff's Motion at 7).  As a general rule, in

determining whether a disability exists, an ALJ "owe[s] a duty to a claimant to develop the record fully and fairly to ensure that his decision is an informed decision based on sufficient facts." *Brock v. Chater*, 84 F.3d 726, 728 (5th Cir. 1996) (citing *Kane*, 731 F.2d at 1219). But a failure to do so is reversible error only if it results in prejudice to the claimant. *See Newton*, 209 F.3d at 456-57; *Ripley*, 67 F.3d at 557. The claimant "must show that, had the ALJ done his duty, []he could and would have adduced evidence that might have altered the result." *Kane*, 731 F.2d at 1220. Here, Hudson does not point to any particular medical report to support her claim, nor does she cite any additional evidence that a doctor could have produced that might have led to a different outcome. In the absence of a showing of prejudice, the ALJ did not err in failing to further develop the record. Plaintiff presents no basis for remand on this point.

*Hypothetical question to vocational expert witness*

Plaintiff complains that the ALJ could not rely on the testimony from the vocational expert witness, because the hypothetical question posed to him included a flawed RFC. (Plaintiff's Motion at 12). Plaintiff argues, specifically, that the question to Mr. Stanfill "failed to include proper consideration of [Plaintiff's] non-exertional impairment of pain." (*Id.* at 11). Fifth Circuit rulings are clear that, to support a non-disability finding, any hypothetical question that is posed to a vocational expert witness must "incorporate reasonably all disabilities of the claimant [that are] recognized by the ALJ" and that are supported by the objective medical evidence. *Boyd v. Apfel*, 239 F.3d 698, 707 (5th Cir. 2001); *Bowling v. Shalala*, 36 F.3d 431, 436 (5th Cir. 1994); *and see Carey v. Apfel*, 230 F.3d 131, 145 (5th Cir. 2000); *Morris v. Bowen*, 864 F.2d 333, 336 (5th Cir. 1988). It has already been determined that the ALJ's findings on Plaintiff's credibility are supported by substantial evidence. For that reason, he was entitled to

exclude her subjective complaints of pain from the hypothetical question posed to the vocational expert witness.  Plaintiff presents no basis for remand on this point.

*Plaintiff's Ability to Maintain Employment*

As a final matter, Plaintiff argues that the ALJ was required to find that she was capable of "*maintaining*" employment, because her impairments would "wax and wane in severity." (Plaintiff's Motion at 13).   In response, the Commissioner emphasizes that "Plaintiff never alleged that she was able to work only on an intermittent basis; rather, she claimed that she became totally and permanently disabled on May 1, 2007."  (Defendant's Reply at 5).  Defendant also argues that "inherent in the definition of 'residual functional capacity' is the understanding that the claimant can maintain work at the level of her assigned residual functional capacity." (*Id*. at 6).  Defendant insists that the ALJ is not required to make a specific finding that the claimant can maintain employment absent evidence that her "ability to maintain employment would be compromised despite the ability to perform employment as an initial matter, or an indication that the ALJ did not appreciate that the ability to perform work on a regular and continuing basis was inherent in the residual functional capacity finding."  (*Id*. at 6-7).

Here, the ALJ made no explicit findings on whether Hudson is able to maintain employment.  (*See generally* Tr. 11-20).  However, in discussing her credibility, the ALJ did note that Hudson testified she "has not been able to maintain employment due to her condition." (Tr. at 15).  Further, at the administrative hearing, the medical expert, Dr. Tarrand, testified that she could not "conclude from a [GAF] score in the 40s that that particular person is … not able to hold a job."  (Tr. at 49).  In addition, Dr. Tarrand stated that the

> [E]ntire assessment of [Hudson's] functional limitations depends on whether or not one takes her symptoms at face value…. [I]f one agrees that she has a psychotic depression almost completely unresponsive to medication then a number of these things would be at a much higher level.  For example performing

> activities within a schedule, maintaining regular attendance … All of those tings
> would certainly be markedly limited.  If one believes that she is not having
> psychosis to the degree that she says and that she's essentially malingering then I
> don't know what the basis would be for any limitations.

(Tr. at 54).  From this testimony, it seems apparent that Plaintiff's credibility also played a role in

the decision on whether she could "maintain regular attendance" at a job.  (*See id.*).

The Fifth Circuit first discussed the issue of a claimant's ability to maintain employment

in *Singletary v. Bowen*.  798 F.2d 818 (5th Cir. 1986).  In that case, the court held that  "a finding

that a claimant is able to engage in substantial gainful activity requires more than a simple

determination that the claimant can find employment and that he can physically perform certain

jobs; it also requires a determination that the claimant can hold whatever job he finds for a

significant period of time."  *Id.* at 822; *accord Watson v. Barnhart*, 288 F.3d 212 (5th Cir. 2002)

(extending holding in *Singletary* to cover physical impairments).   The Fifth Circuit later

explained, however, that "nothing in [these cases] suggests that the ALJ must make a specific

finding regarding the claimant's ability to maintain employment in every case."   *Frank v.

Barnhart*, 326 F.3d 618, 619 (5th Cir. 2003).  Instead, "[they] require a situation in which, by its

nature, the claimant's physical ailment waxes and wanes in its manifestation of disabling

symptoms."  *Id.*  In other words,

> absent evidence that a claimant's ability to maintain employment would be
> compromised despite his ability to perform employment as an initial matter, or an
> indication that the ALJ did not appreciate that an ability to perform work on a
> regular and continuing basis is inherent in the definition of [residual functional
> capacity], we do not read *Watson* to require a specific finding that the claimant
> can maintain employment.

*Dunbar v. Barnhart*, 330 F.3d 670, 672 (5th Cir. 2003).

The hearing transcript shows that the ALJ heard testimony on whether Hudson's alleged

limitations would impair her ability to maintain employment.  As stated previously, the ALJ

provided a detailed analysis setting out the reasons that he found Plaintiff's allegations to lack credibility.  Moreover, Plaintiff never claimed that her symptoms "waxed" and "waned," nor do the medical records support that allegation.  (Tr. at 196-440).  In fact, Plaintiff claimed that as of May 1, 2007, she was "unable to work."  (Tr. at 125, 137).  For these reasons, no explicit finding on that point was required. *See Dunbar*, 330 F.3d at 672. Plaintiff presents no basis for remand on this issue.

**CONCLUSION**

Based on the foregoing, it is **RECOMMENDED** that Defendant's motion be **GRANTED,** and that Plaintiff's motion be **DENIED**.

The Clerk of the Court shall send copies of the memorandum and recommendation to the respective parties, who will then have fourteen days to file written objections, pursuant to 28 U.S.C. § 636(b)(1)(c).  Failure to file written objections within the time period provided will bar an aggrieved party from attacking the factual findings and legal conclusions on appeal. *Douglass v. United Servs. Auto. Ass'n*, 79 F.3d 1415, 1428-29 (5th Cir. 1996) (en banc).

The original of any written objections shall be filed with the United States District Clerk, P.O. Box 61010, Houston, Texas 77208; copies of any such objections shall be delivered to the chambers of Judge Lee H. Rosenthal, Room 11535, and to the chambers of the undersigned, Room 7007.

**SIGNED** at Houston, Texas, this 16th day of February, 2012.

**MARY MILLOY**
**UNITED STATES MAGISTRATE JUDGE**